**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 22-2103**

———————

ELSY ESTELA DIAZ-HERNANDEZ; ISAI DIAZ-HERNANDEZ,

Petitioners,

v.

MERRICK B. GARLAND, Attorney General,

Respondent.

———————

**No. 23-1291**

———————

ELSY ESTELA DIAZ-HERNANDEZ; ISAI DIAZ-HERNANDEZ,

Petitioners,

v.

MERRICK B. GARLAND, Attorney General,

Respondent.

———————

On Petitions for Review of Orders of the Board of Immigration Appeals.

———————

Argued: January 24, 2024                    Decided: June 10, 2024

———————

Before NIEMEYER, AGEE, and THACKER, Circuit Judges.

———————————

Petitions denied by published opinion. Judge Niemeyer wrote the opinion, in which Judge Agee Joined. Judge Thacker wrote a separate concurring opinion.

———————————

**ARGUED:** Jake Shatzer, UNIVERSITY OF GEORGIA SCHOOL OF LAW, Athens, Georgia, for Petitioners. Colin James Tucker, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** John W. Goodman, Benjamin J. Osorio, MURRAY OSORIO PLLC, Fairfax, Virginia; Thomas V. Burch, Appellate Litigation Clinic, UNIVERSITY OF GEORGIA SCHOOL OF LAW, Athens, Georgia, for Petitioners. Brian Boynton, Principal Deputy Assistant Attorney General, Sabatino F. Leo, Assistant Director, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

NIEMEYER, Circuit Judge:

After illegally entering the United States, Elsy and Isai Diaz-Hernandez, a sister and brother who are both natives and citizens of El Salvador, applied for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). They claimed that they had suffered harm or fear of harm in El Salvador from their maternal uncle, Jose Enoc Hernadez Avalos, who abused them to avenge his earlier deportation from the United States, for which he blamed Elsy and Isai's mother. They sought relief as members of a social group defined as "children of their mother," and maintained that they suffered harm from their uncle on account of their membership in that group. The Immigration Judge ("IJ") found, however, that revenge was not a central reason for Jose's abuse of Elsy and Isai but at most a "tangential reason." Instead, the IJ found that the uncle was overall an "aggressive person" whose abuse was directed at a wider range of people and was "triggered because of his drug, alcohol, and mental health issues." Accordingly, the IJ concluded that Elsy and Isai failed to establish the required nexus between their harm and a protected ground and therefore the requirements for either asylum or withholding of removal.

On appeal, the Board of Immigration Appeals ("BIA") affirmed and dismissed the appeal. In doing so, it rejected the petitioners' argument that the evidence showed that their relationship to their mother was "at least one central reason" for the uncle's abusive behavior against them. The BIA noted that the IJ's finding that the petitioners failed to demonstrate the necessary nexus between the harm and a protected ground was "a classic factual question," and after reviewing the facts, concluded that the IJ did not clearly err.

3

The petitioners then filed a motion for reconsideration, arguing that the BIA's decision improperly applied the "one central reason" nexus standard to their withholding of removal claims. They contended that, when assessing their withholding of removal claims, the BIA should have instead considered whether the protected ground was merely "a reason" for the uncle's harm, not "one central reason," relying on a difference in the statutory language. *Compare* 8 U.S.C. § 1231(b)(3)(A), (C) (relating to withholding of removal) *with id.* § 1158(b)(1)(B)(i) (relating to asylum). The BIA, however, denied their motion.

On Elsy and Isai's petitions for review, we conclude that substantial evidence supported the agency's finding that the petitioners failed to establish the requisite nexus between the harm they feared and their family tie. We also reject their argument that the BIA applied the wrong standard for assessing whether they met their burden to prove the required nexus with respect to their withholding of removal claims. Thus, we deny their petitions for review.

I

Elsy and Isai Diaz-Hernandez crossed the border from Mexico to Hidalgo, Texas, unaccompanied and without inspection, in August 2015. At that time, Elsy was 13 years old and Isai, 11. For more than a decade before then, the two had been living with their grandparents in El Salvador, while their parents were living in the United States. Soon after they arrived in the United States, they were taken into the custody of the Department of Health and Human Services and given a notice to appear. Shortly thereafter, they were

4

released to their father's custody and moved to Maryland, where both their parents and younger sibling were living.

In October 2015, Elsy and Isai appeared before an IJ and conceded that they were removable under 8 U.S.C. § 1182(a)(6)(A)(i), but they submitted applications for asylum. In their applications, they expressed fear that, if they were to return to El Salvador, their uncle would abuse them in revenge for their mother's role in the uncle's deportation from the United States in 2014. Later, they also sought withholding of removal and CAT relief.

On June 17, 2019, Elsy and Isai, represented by counsel, appeared before the IJ for a hearing on the merits of their applications. Both testified at the hearing, as did their mother, Cesiah Elizabeth Hernandez-Diaz. Cesiah recounted that, at some point in 2014, her brother Jose Enoc Hernandez Avalos, who was living with her in the United States, came home "under the influence of drugs, drunk" and "grabbed [her] by the neck," "want[ing] to throw [her] out the window from the second floor." After someone called the police, Jose was arrested, and thereafter deported to El Salvador. Before leaving, Jose told Cesiah that "he was . . . going to repay the consequences to [her] children." In El Salvador, Jose moved into his parents' house, where Cesiah's siblings and two of her children — the petitioners Elsy and Isai — were living. Cesiah testified that she had not spoken to Jose since he was deported but that she had been in contact with her parents, and her father told her that when Jose was "under the influence of drugs and drunk," he mistreated her parents by beating them. Cesiah explained that "[h]e beats [her] parents, and [her] sisters, and when he goes crazy with the drugs, he beats everyone." According to Cesiah, Jose had been hospitalized for this behavior, and "when he's not drugged up,

5

he's fine, but when he's under the influence of drugs, alcohol, he doesn't — he misbehaves."

Elsy testified next. She stated that after Jose returned to El Salvador in 2014, "he started hitting [her] brother," Isai. She recalled an incident in which Isai did not give her uncle the television remote, so Jose hit him, and she recalled another time when Jose yanked Isai out of the hammock. Indeed, she said that Jose hit Isai "[a]lmost every day." Elsy also described Jose's abuse of others. She testified that he insulted her aunts, tried to drown his wife, and hit Elsy's grandmother and grandfather. When asked whether Jose "ever hit [her] or abused [her] in any way," Elsy stated, "[w]ell once, he was bothering me and trying to get me angry," so she hit him with a broom. She added that while Jose wanted to hit her back, Elsy's grandparents "defended [her]." Elsy further testified that, on multiple occasions, Jose had been admitted to a rehabilitation facility. She then explained that "when [her] grandparents saw that [Jose] was taking [his aggression] out on [Elsy and Isai] because he had been deported because he beat [her] mother, that's when [the grandparents] made the decision to send [her] [to the United States]."

Isai was the last to testify. He said that his uncle would "hit [him] all the time," "three or two times a day," "[n]ormally when [Isai] was watching T.V. or playing." He recalled the incident in which his uncle hit him while he was in the hammock and told him to "[b]e a man" and "[d]on't be a fairy." Isai also testified to Jose's hitting his grandfather. Isai stated that he believed the reason for Jose's actions was "revenge for the fact that [his] mother had sent him back to El Salvador."

6

In addition to this testimony, Elsy and Isai presented documents regarding country conditions in El Salvador and affidavits from other members of their extended family, which provided information about Jose's conduct consistent with the testimony given. In the affidavits, the family members explained that, after Jose returned to El Salvador in 2014, he was physically abusive to many people and that Elsy and Isai witnessed that abuse. One of Cesiah's sisters stated, for example, that Jose kicked the family's neighbor, hit the neighbor's son, attacked another of the siblings, bothered a man in a park, and harmed his romantic partner so badly that she was hospitalized for two weeks. This additional evidence also showed that Jose had, on multiple occasions, been admitted to a rehabilitation facility in El Salvador for his drug and alcohol abuse and mental health issues.

At the outset of her oral decision, the IJ incorporated an addendum that stated the standards of law and burdens of proof relevant to the issues, copies of which she had served on the parties. Among other things, the addendum explained that, to gain asylum, one element an applicant had to show was a "nexus" to a statutorily protected ground. The addendum stated that persecution on the basis of a protected ground, such as belonging to a particular social group, must be "'at least one central reason' for the persecutor's action against them." (Quoting 8 U.S.C. § 1158(b)(1)(B)(i)). It continued, "the protected ground need not be the sole reason for persecution, but it must have been more than an 'incidental, tangential, superficial, or subordinate' reason." (Quoting *Zavaleta-Policiano v. Sessions*, 873 F.3d 241, 247 (4th Cir. 2017)).

Turning to the evidence, the IJ recounted that Cesiah testified about how her brother had assaulted her in 2014 and how he had returned to live with their parents in El Salvador,

7

where he was hospitalized for months due to his substance abuse and violent behavior. The IJ noted that Cesiah stated that her brother was "okay unless he's under the influence of drugs or alcohol." The IJ then summarized how Elsy testified that "initially things were well" after her uncle returned to El Salvador in 2014, but "problems began when he would drink or take drugs," and he "started to hit her brother." The IJ acknowledged Elsy's testimony regarding how her uncle attended a mental health rehabilitation center several times; how he hit other members of the family; how the police would come because the uncle was drinking and smoking but not arrest him; how he would hurt other people outside of Elsy's immediate family; and how he would taunt her. Finally, the IJ summarized Isai's testimony regarding how his uncle would hit him and insult him, and how Isai believed these attacks were "revenge" for "his mother being responsible for his uncle being deported." The IJ found the testimony of the siblings and their mother credible.

After recounting the testimony, the IJ turned to the question of whether the siblings established a well-founded fear of persecution on the basis of a particular social group, which the siblings needed to prove in order to receive asylum or withholding of removal. While the IJ deemed Elsy and Isai's proposed social group — "Salvadoran children of a parent who caused removal of another person" — to be too amorphous to qualify as a viable social group, she did recognize that they were members of a cognizable social group — "children of their mother." Thus, if they could demonstrate persecution or a well-founded fear of persecution on account of their relationship with their mother, they could meet the requirements of the core element that they were persecuted or feared persecution on the basis of their membership in a particular social group.

8

The IJ found as fact that Jose did not target the siblings on account of their ties to their mother and therefore that the siblings had failed to establish a nexus between the harm they feared and the particular social group. Instead, the IJ found that Jose was indiscriminately aggressive, observing that he had been aggressive toward (1) Cesiah in the United States, (2) his mother and father, (3) a child next door, (4) his other sister, (5) someone in the park, (6) his romantic partner, and (7) his romantic partner's mother. "He was," the IJ found, "just an, overall, aggressive person," and his aggression was "triggered because of his drug, alcohol, and mental health issues." Furthermore, the IJ found important that Jose "did not harm Elsy, who is a daughter of her mother," suggesting that the mistreatment of Isai was not on account of his relationship to their mother. "[M]embership in the family" the IJ found, "was tangential, and that was not the uncle's motive." She found that, "even if [Jose] did mention the fact that his sister was instrumental in him being deported, . . . that was not the reason for his aggressive behavior." She emphasized that "he never bothered [Elsy,] one of his sister's children," and "it all seemed to be triggered when he was drunk, under the influence of alcohol, or because of his mental health issues." The IJ thus concluded that "the harm experienced by . . . Isai" and the harm that "[Elsy] did not suffer . . . at all" bore no nexus to the siblings' relationship to their mother. Thus, the IJ concluded that the petitioners had not established that their persecution or well-founded fear of future persecution was on account of a protected ground and therefore had not satisfied the requirements for obtaining asylum. In addition, the IJ found no unwillingness or inability on the part of the Salvadoran officials to assist the siblings.

9

After denying the siblings' asylum claims, the IJ also denied their request for withholding of removal and CAT relief, which would only have been available if they had shown a stronger likelihood of harm than that required for asylum.

Elsy and Isai appealed the IJ's decision to the BIA, raising numerous arguments, the most relevant of which was that the IJ erroneously found that the siblings' relationship with their mother was not "one central reason" for Jose's aggression toward them. They also argued that they did in fact show that the Salvadoran police were unwilling or unable to protect them from the harm they feared.

The BIA dismissed the appeal with a decision dated September 27, 2022, affirming the IJ's determination that the petitioners had not established past persecution or a well-founded fear of future persecution *on account of* a protected ground. (Citing 8 U.S.C. § 1158(b)(1)(B)(i) and *Cruz v. Sessions*, 853 F.3d 122, 127–28 (4th Cir. 2017)). Recognizing that a persecutor's motive presented "a classic factual question," the BIA concluded that the IJ did not clearly err in her factual findings. (Quoting *Crespin-Valladares v. Holder*, 632 F.3d 117, 127–28 (4th Cir. 2011)). Specifically, it upheld the IJ's finding that "there [was] no nexus" between the siblings' fear of Jose and their status as children of their mother. While the BIA recognized further that Jose "did mention that his sister was instrumental in him being deported," it affirmed the IJ's finding that Jose's "aggressive behavior toward the siblings and others was caused by [his] mental health and alcohol abuse," pointing to evidence that the uncle was aggressive toward several other family members, neighbors, and strangers. The BIA stated that the uncle "would have likely acted violently toward them even if they were not members of the particular social

10

group." Consequently, it affirmed the IJ's conclusion that the siblings failed to show past persecution or a well-founded fear of future persecution on account of a protected ground, thus holding that the siblings were not entitled to asylum.

In addition, the BIA held that the siblings did not meet their burden regarding withholding of removal, citing *Matter of C-T-L-*, 25 I. & N. Dec. 341, 350 (BIA 2010), which held that the "one central reason" standard also applies to withholding of removal claims brought pursuant to 8 U.S.C. § 1231(b)(3).

Because the nexus issue was dispositive of the petitioners' asylum and withholding of removal claims, the BIA did not reach the question of whether the Salvadoran government was unable or unwilling to protect the siblings from their uncle. The BIA also affirmed the IJ's conclusion that the siblings were ineligible for relief under the CAT because they failed to show that, "notwithstanding their fear of their uncle," they would more likely than not be tortured in El Salvador by or with the acquiescence of a government official.

Elsy and Isai filed a motion for reconsideration with the BIA, arguing that the BIA should have applied a less stringent "one reason" standard to their withholding of removal claim, as specified by statute. Under that standard, the siblings argued, they would be eligible for withholding of removal because their relationship to their mother was clearly "one reason" for their harm — even if not "a central reason." The BIA denied the petitioners' motion for reconsideration with a brief decision dated February 21, 2023.

11

The siblings thereafter filed petitions for review of (1) the BIA's September 22, 2022 decision dismissing their appeal and (2) its February 21, 2023 decision denying their motion for reconsideration.  We consolidated the two petitions for review.

II

First, with respect to the BIA's denial of their asylum claims, Elsy and Isai challenge the IJ's factual findings and the BIA's affirmance of them.  They argue that "both the Board and the IJ disregarded [Jose's] words and found that he merely 'mention[ed]' the Petitioners' mother."  They maintain that the IJ did not give sufficient weight to the "persecutor's own words," instead "focusing on his motive for targeting other people," which, they maintain, is irrelevant.  At bottom, their challenge is to the agency's factfinding, arguing that Jose's intent to punish the petitioners' mother was "one central reason" for his harming Elsy and Isai and that the IJ clearly erred in finding otherwise.

To receive asylum, an applicant must prove:

> (1) that the applicant has suffered past persecution or has a well-founded fear of future persecution; (2) that the persecution is "on account of" her race, religion, nationality, membership in a particular social group, or political opinion; and (3) that the persecution is perpetrated by an organization that her home country's government is unable or unwilling to control.

*Arita-Deras v. Wilkinson*, 990 F.3d 350, 357 (4th Cir. 2021); *see also* 8 U.S.C. §§ 1158(b)(1)(A), 1101(a)(42)(A).  And to prove the second element — that the persecution was "on account of" a protected ground — the applicant must prove that the ground "was or will be at least *one central reason* for persecuting the applicant."  8 U.S.C. § 1158(b)(1)(B)(i) (emphasis added).  Under this "one central reason" standard, "[t]he

12

applicant need not prove that the protected ground was *the* central reason or even a dominant central reason for persecution." *Zavaleta-Policiano*, 873 F.3d at 247 (cleaned up). Rather, the applicant "need only show that the protected ground was *more than* an incidental, tangential, superficial, or subordinate reason underlying the persecution." *Id.* (emphasis added) (cleaned up); *see also Madrid-Montoya v. Garland*, 52 F.4th 175, 179 (4th Cir. 2022).

The determination of whether a reason is "a central reason" or only an incidental or tangential one is a "classic factual question." *Crespin-Valladares*, 632 F.3d at 127–28. And we owe a high level of deference to the agency's factual findings. We are required to treat "them as *conclusive* unless any reasonable adjudicator would be *compelled* to conclude to the contrary." *Portillo Flores v. Garland*, 3 F.4th 615, 626 (4th Cir. 2021) (en banc) (emphasis added) (cleaned up); *see also* 8 U.S.C. § 1252(b)(4)(B). Under this highly deferential standard, we clearly cannot substitute our judgment for that of the agency's by "reweigh[ing] the evidence and determin[ing] which of the competing views is more compelling." *Mulyani v. Holder*, 771 F.3d 190, 200 (4th Cir. 2014) (cleaned up). Thus, "if the record plausibly could support two results — the one the agency chose and the one the petitioner advances — we must defer to the agency." *Madrid-Montoya*, 52 F.4th at 179–80 (cleaned up). These principles are especially applicable here, where the petitioners challenge factual findings and the weight that the agency gave to the evidence.

The petitioners argue extensively about the reasonableness of factual findings made by the IJ as affirmed by the BIA, maintaining essentially that the IJ placed too great an emphasis on Jose's treatment of others. In essence, they are asking us to reweigh

13

competing views. While they argue that Jose's revenge against his sister was a central reason for his conduct against her children, the IJ found that reason tangential. And she explained why at length:

> Here we have uncle, brother, Jose, who appears to be aggressive because of mental health, drug, and alcohol issues. He was aggressive to his sister while she was in the United States. That was prior to him being deported. He was aggressive toward his father and his mother. He was aggressive toward the child next door. He attacked his sister, Demari, stating he would kill the whole family. He was aggressive with someone in the park that might have been a gang member. He was aggressive with his partner when she was pregnant, pushed her, and then pushed his mother when she was trying to protect her. He was just an, overall, aggressive person. That aggressiveness appears to have been triggered because of his drug, alcohol and mental health issues. And it will also be noted that he did not harm Elsy, who is a daughter of her mother. He didn't harm her. But he seemed to have harmed everybody else. And so, the court finds that in this case, membership in the family was tangential, and that was not the uncle's motive. That he would have acted the same whether the children were children of his sister, or whether they were his sister, or whether they were just people who were living in the house, or whether they were the boy next door, or someone in the park, or his girlfriend. It doesn't matter. He was just aggressive because of his personal struggles. And again, this is worth noting that he did not harm Elsy at all, who is a child of her mother, and they all lived in the same house.

All of these findings were supported by evidence in the record.

On appeal, the BIA gave close consideration of the IJ's findings and affirmed, concluding that there was "no clear error in the Immigration Judge's determination that there [was] not a nexus between the harm and the protected ground." As the BIA explained:

> On appeal, the respondents argue that the Immigration Judge did not properly analyze the issue of nexus as it pertains to their claim that their uncle threatened and abused them as revenge against their mother, whom he blames for his removal from the United States. We discern no clear error in the Immigration Judge's findings that although the uncle "did mention the fact that his sister was instrumental in him being deported," the motivation

14

> for his "aggressive behavior" toward the respondents (and other non-familial people) were his mental health issues and alcohol abuse. As the Immigration Judge found, during some of the abuse incidents the respondents described, their uncle also attempted to assault his sister and his father, who he did not connect to respondents' mother or to his removal, out of his own aggression, substance abuse and mental health issues. The uncle was also aggressive with the neighbor's child and with strangers, and had to be restrained by officials who took him to a mental health hospital.

(Citations omitted).

While we understand that the petitioners disagree with the factual findings, they essentially are requesting that we reweigh the evidence. This, however, would violate the applicable and highly deferential standard of review. We must treat the agency's factual findings as "*conclusive*" unless a reasonable adjudicator "would be *compelled* to conclude" otherwise. *Portillo Flores*, 3 F.4th at 626 (emphasis added). And under this highly deferential standard, we readily conclude that the IJ's factual findings, as affirmed by the BIA, were supported by substantial evidence taken as a whole. We affirm the agency's factual findings and therefore its denial of the petitioners' applications for asylum.

## III

Elsy and Isai also contend that, with respect to their claims for withholding of removal, the IJ and BIA should have applied a less-stringent nexus standard than that which the agency applied with respect to their asylum claims. They note that in disposing of *the asylum claim*, the BIA concluded that they had failed to show that a protected ground under the Immigration and Nationality Act was "one central reason" for their persecution or feared persecution, and in disposing of their *withholding claim*, the BIA again applied the same "one central reason" standard. But they argue, the statutory standard for showing the

15

nexus on withholding of removal claims is, as provided in the relevant statutes, distinct from the standard for approving their asylum claim.  In proving asylum eligibility, applicants must show that a protected ground is "one central reason" for their feared persecution, whereas applicants for withholding of removal must show that the protected ground is merely "a reason."  *See* 8 U.S.C. § 1158(b)(1)(B)(i) (asylum); *id.* § 1231(b)(3)(C) (withholding of removal).  As a consequence, they argue, the BIA applied a more restrictive standard than the statute requires, committing an error of law.

In addressing both the petitioners' asylum claims and withholding of removal claims, the IJ found that the uncle's revenge for his deportation was at most a "tangential" reason for his harm to the siblings and thus that they had not established the requisite nexus. The IJ explained:

> The court finds that even if [the uncle] did mention the fact that his sister was instrumental in him being deported, . . . *that was not the reason for his aggressive behavior*.  Again, he never bothered one of his sister's children, and he bothered a whole lot of other people who were not his sister's children.  And it all seemed to be triggered when he was drunk, under the influence of alcohol, or because of his mental health issues.  *So, the court does not find a nexus between the harm experienced* by at least one of the respondent's Isai, *and the particular social group*, which, again, was not stated by the respondents, but the court finds that it does exist, the particular social group.  *But there is no nexus to the harm*.  And as to Elsy, she did not suffer harm at all. . . .  The court finds that there [was] no nexus between family membership and the harm received by Isai.

(Emphasis added).  On appeal, the BIA affirmed.  It concluded that the IJ's factual findings were not clearly erroneous and that, "[a]bsent clear error in the Immigration Judge's nexus finding, [it] affirm[ed] the Immigration Judge's ultimate holding that the respondents have not shown past persecution or well-founded fear of future persecution *on account of a*

16

*protected ground*." (Emphasis added). Based on this, the BIA concluded that the siblings had not "satisfied the burden of proving eligibility for withholding of removal," citing *Matter of C-T-L-*, 25 I. & N. Dec. 341, 350 (BIA 2010) (holding that the "one central reason" standard applies to applications for withholding of removal under 8 U.S.C. § 1231(b)(3)).

While the BIA affirmed the IJ's factual findings of "no nexus," a legitimate question can be raised whether a challenge to the legal standard applied by the BIA is even relevant, because all parties concede that the petitioners must establish some nexus, by whatever standard, and the IJ found no nexus. Nonetheless, it is clear that the BIA assumed that the nexus standards for proving asylum claims and withholding of removal claims were essentially the same, relying on its decision in *Matter of C-T-L-*.

In *Matter of C-T-L-*, the BIA held that "an applicant for *withholding of removal* must demonstrate that race, religion, nationality, membership in a particular social group, or political opinion was or will be '*at least one central reason*' for the claimed persecution." 25 I. & N. Dec. at 348 (emphasis added). The BIA explained its use of that standard as an interpretation of "a reason" in the statute, noting that when Congress added the "one central reason" language to the asylum statute in 2005, it did not intend to distinguish the asylum's nexus standard from the withholding of removal's nexus standard. *Id.* at 344–48. Rather, as the BIA explained in some detail, with the 2005 amendment, Congress sought to correct certain court opinions construing *the asylum nexus requirement* in the context of "mixed motive" circumstances. *Id.* at 345. While the asylum statute provided that "persecution or a well-founded fear of persecution" must be "*on account of*

17

race, religion, nationality, membership in a particular social group, or political opinion," 8 U.S.C. § 1101(a)(42)(A) (emphasis added), courts were construing that statutory nexus requirement with terms such as "mainly because," "primarily," and "in meaningful part." *See Matter of C-T-L-*, 25 I. & N. Dec. at 345 (citations omitted). In view of these variations, the BIA explained, Congress sought to harmonize these decisions with a requirement that the applicant prove the protected reason was "one central reason." *Id.* at 345–46. As *Matter of C-T-L-* reasons, however, Congress did not intend to create a standard distinct from the nexus requirement in withholding of removal cases, which had *similar causation language* — "because of" a protected ground. *Id.* at 347–48. Indeed, the regulation under the withholding of removal statute construed "because of," as "on account of," the same language used in this asylum statute. *See* 8 C.F.R. § 1208.16(b). Accordingly, courts have used the statutory language describing the nexus between the persecution and a protected ground interchangeably. *See, e.g.*, *INS v. Elias-Zacarias*, 502 U.S. 478, 481–83 (1992). Thus, as *Matter of C-T-L-* concluded, Congress did not intend to create two distinct causation standards when enacting the 2005 amendment, but only to clarify the requirements for proving asylum eligibility. As the BIA explained:

> Congress's silence regarding the "mixed motive" application to withholding of removal cases is best understood through the legislative history, which noted a disagreement with the cases that arose in the context of asylum, not withholding of removal. . . . [I]n modifying the asylum standard, Congress believed it had fixed the problem and provided a "uniform standard for assessing motivation" in related forms of relief that generally arise in the same case. H.R. Rep. No. 109–72, at 163.

25 I. & N. Dec. at 347. And the BIA repeated that "all indications are that Congress intended to apply the 'one central reason' standard uniformly to both asylum and

18

withholding claims, as the Department of Homeland Security and the American Immigration Lawyers Association discuss in their briefs." *Id.* at 346. The BIA also gave numerous practical and logical reasons why the nexus standard for both asylum claims and withholding of removal claims must be the same. *See id.* at 345–48.

We find the BIA's reasoning in *Matter of C-T-L-* persuasive. The elements of both asylum claims and withholding claims have over the years *uniformly* required a showing of persecution or threatened persecution *on account of* the same protected grounds: "race, religion, nationality, membership in a particular social group, or political opinion." Thus, in a mixed-motive case, a court construing the proof required for the nexus requirement would reasonably require uniformly a central reason and reject any non-meaningful, tangential, or incidental reason. *See, e.g.*, *Madrid-Montoya*, 52 F.4th at 179.

Even were we to focus independently on only the "a reason" standard in the withholding of removal statute, we would come to the same result. The statute provides that an alien may not be removed to a country "if the Attorney General decides the alien's life or freedom would be threatened in that country *because of* the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A) (emphasis added). And regulations under this provision equate the "because of" standard with an "on account of" standard — the same as provided in the asylum statute. 8 C.F.R. § 1208.16(b); 8 U.S.C. § 1101(a)(42)(A) (applying "on account of" standard to the asylum nexus). To prove persecution or fear of persecution *on account of* a protected ground — an element common to asylum and withholding of removal claims — some reason must obviously be given. But that does not mean that every reason or any

19

reason would suffice. Surely a reason must be a meaningful or substantial contribution to the cause — not meaningless, tangential, or incidental. While even a grain of sand might cause a ripple in water, common sense would not call such a ripple a wave. Likewise, the parties here accept that not *any* reason can suffice; it must be a reason sufficient to conclude that the persecution or fear of persecution was *because of* the protected grounds.

At bottom, therefore, we reach the same conclusion the BIA did in *Matter of C-T-L-* — that the same nexus defined in asylum and withholding of removal must be proved by the same quantum of reason. In reaching this conclusion, we recognize that our resolution of this issue varies from some of our sister circuits. On one hand, our view aligns with the Second Circuit's decision that the agency's interpretation is reasonable and thus would be entitled to deference under the doctrine of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See Quituizaca v. Garland*, 52 F.4th 103, 109–14 (2d Cir. 2022). We depart, however, from conclusions that the withholding statute unambiguously sets forth a nexus standard distinctly *less* demanding or *more* onerous than that set forth in the asylum statute. *Compare Barajas-Romero v. Lynch*, 846 F.3d 351, 359–60 (9th Cir. 2017) (holding that the "a reason" is a less demanding standard than "one central reason"), *and Guzman-Vazquez v. Barr*, 959 F.3d 253, 272–74 (6th Cir. 2020) (same), *with Guzman-Vazquez*, 959 F.3d at 288 (Murphy, J., dissenting) (interpreting the withholding statute to require showing that the applicant's protected characteristic is a "but-for" cause of persecution), *and Quituizaca*, 42 F.4th at 117 (Sullivan, J., concurring) (opining that the withholding statute "calls for a motive standards *at least as strict* as the asylum statute's 'one central reason' standard"). Rather,

20

we are persuaded by the BIA's reasoning in *Matter of C-T-L-* that Congress intended the nexus standards in the two statutes to remain the same. *Accord Gonzalez-Posadas v. Attorney General U.S.*, 781 F.3d 677, 685 n.6 (3d Cir. 2015) ("We believe that the Board's decision in *Matter of C-T-L-* to extend the 'one central reason' test to withholding of removal was sound and we likewise adopt that conclusion now"). Accordingly, regardless of any deference we were to give the agency's interpretation, we would reach the same conclusion — a conclusion that is, in fact, harmonious with well-established Fourth Circuit law. We are not plowing new ground.

Even after Congress's 2005 amendment of the asylum provision, we have treated the nexus standards for asylum and withholding of removal *as the same*, indeed without much discussion. *See, e.g.*, *Madrid-Montoya*, 52 F.4th at 179; *Quinteros-Mendoza v. Holder*, 556 F.3d 159, 164–65 (4th Cir. 2009); *Salgado-Sosa v. Sessions*, 882 F.3d 451, 456–57 (4th Cir. 2018). In *Quinteros-Mendoza*, where we addressed both asylum and withholding of removal claims, we recognized that the 2005 amendment did not "radically alter the standard in mixed motive cases," noting that the nexus *in both* reasonably must be more than "incidental, tangential, superficial, or subordinate." 556 F.3d at 164 (cleaned up). Again, in *Salgado-Sosa*, which also involved asylum and withholding of removal claims, we noted:

> The primary issues on appeal involve Salgado-Sosa's applications for asylum and withholding of removal. Both asylum and withholding of removal are based on an applicant's showing of persecution, or, more specifically persecution on account of a statutorily protected status, a list that includes "membership in a particular social group" as well as race, religion, nationality, and political opinion. . . . *[T]he core condition of eligibility —*

21

> *that there be a nexus between threatened persecution and protected status — is the same.*

882 F.3d at 456–57 (emphasis added). Then we applied the same "at least one central reason" standard in resolving the nexus requirements. *Id.* at 457. And in *Madrid-Montoya*, while addressing applications for both asylum and withholding of removal, we observed that the "nexus requirement" was the same for the two claims. We observed that "[i]f an applicant fails to satisfy *the nexus requirement*, she cannot obtain *asylum or withholding of removal*," 52 F.4th at 179 (emphasis added), and we then defined the proof of the nexus requirement to be under the "one central reason" standard. *Id.*; *see also*, *e.g.*, *Garcia v. Garland*, 73 F.4th 219, 229 (4th Cir. 2023); *Quintero v. Garland*, 998 F.3d 612, 631 (4th Cir. 2021); *Perez Vasquez v. Garland*, 4 F.4th 213, 221 n.7 (4th Cir. 2021); *Villatoro v. Sessions*, 685 F. App'x 242, 247 (4th Cir. 2017); *Oliva v. Lynch*, 807 F.3d 53, 58 n.3 (4th Cir. 2015); *Gitata v. Holders*, 486 F. App'x 369, 369 n.3 (4th Cir. 2012); *Abdel-Rahman v. Gonzales*, 493 F.3d 444, 453 n.12 (4th Cir. 2007).

While the government reasonably questions whether the petitioners adequately preserved their challenge to the nexus standard that the BIA applied to their withholding of removal claims, we conclude, without the need of resolving that issue, that the petitioners' argument that the nexus requirement for withholding of removal can be established by *any reason* — however incidental, tangential, or superficial — is unpersuasive. The statutory requirement of causation — "because of" and "on account of" — requires more, and Congress's exposition of that more in the context of asylum claims

22

was as good a definition as any for construing "a reason" in connection with withholding of removal claims.

Accordingly, we affirm the BIA's application of the "one central reason" standard for proving the nexus element in both asylum claims and withholding of removal claims.

PETITIONS DENIED

THACKER, Circuit Judge, concurring:

I concur in the majority opinion. I write separately only to underscore the correct legal standard and to illuminate why I reject Elsy and Isai's ("Petitioners") argument that the IJ erred as a matter of law by applying an incorrect standard.

As the majority explains, to succeed on their claims for asylum and cancellation of removal, Petitioners were required to demonstrate that "that [a] protected ground was or would be 'at least one central reason' for the persecution." *Perez Vasquez v. Garland*, 4 F.4th 213, 221 (4th Cir. 2021) (quoting 8 U.S.C. § 1158(b)(1)(B)(i)). "[T]he protected ground need not be "*the* central reason or even a dominant central reason" for the applicants' persecution." *Id.* (quoting *Crespin-Valladares v. Holder*, 632 F.3d 117, 127 (4th Cir. 2011)). "Rather, the applicant[s] must demonstrate that their protected status was or would be 'more than an incidental, tangential, superficial, or subordinate reason' for their persecution." *Id.* As we have recognized, "a persecutor's motivation is a 'classic factual question' reviewed for substantial evidence." *Perez Vasquez*, 4 F.4th at 221 (internal citations omitted). Nevertheless, we have explained that we review de novo 'whether the [BIA] and the [IJ] applied the correct legal standard' in their nexus analysis." *Perez Vasquez*, 4 F.4th at 221 (internal citations omitted).

Petitioners argue that by failing to consider whether there were "intertwined reasons" for Jose's persecution of them -- his alcohol/mental health struggles *and* his retribution for his sister's role in his deportation -- the IJ applied an incorrect legal standard. Petitioners are correct that it is "a misapplication of the statutory nexus standard" for the BIA to "fail[] to consider the intertwined reasons" for persecution. *Perez Vasquez*, 4 F.4th

24

at 224.  That is because, "[a]s we have 'repeatedly emphasized, it is enough that the protected ground be *at least one* central reason for the persecution—that is, one central reason, *perhaps intertwined with others*, why the applicant, and not another person was threatened.'"  *Id.* (quoting *Hernandez-Cartagena*, 977 F.3d at 320) (emphases in original).  Indeed, "we have recognized [that] 'more than one central reason may, and often does, motivate a persecutor's actions.'"  *Madrid-Montoya*, 52 F.4th at 181 (quoting *Cruz v. Sessions*, 853 F.3d 122, 128 (4th Cir. 2017)).  And the BIA errs when it "focus[es] narrowly on the 'immediate trigger'" for violence, at the expense of considering what "prompted the asserted persecution."  *Salgado-Sosa v. Sessions*, 882 F.3d 451, 458 (4th Cir. 2018) (quoting *Oliva v. Lynch*, 807 F.3d 53, 60 (4th Cir. 2015)).

In *Portillo Flores v. Garland*, for example, the petitioner sought asylum claiming that he was persecuted by MS-13 on account of his family membership.  3 F.4th 615, 631 (4th Cir. 2021).  He testified credibly that each time the gang members beat him they asked about his sister, and that when he did not give them her phone number, he was threatened and beaten by the gang.  *Id.*  And the credible testimony from other witnesses confirmed that the petitioner "was beaten and threatened *because he was Paola's brother*."  *Id.* (emphasis in original).  But "instead of recognizing the significance of this testimony, the IJ incomprehensively opined, '[t]he fact that gang members sought information from Petitioner about his sibling without more does not support'" his claim that the persecution was on account of his family.  *Id.*  "The BIA likewise turned a blind eye to this evidence," and instead looked to its "well established [recognition] that generalized violence affecting the population at large is not a basis for asylum."  *Id.*  We rejected that reasoning and

25

reaffirmed that the BIA "should consider specific and intertwined reasons for the threats made in each case." *Id.*

Thus, if Petitioners were correct that the IJ failed to consider the possibility of "intertwined reasons" for Jose's aggression toward them, remand would be warranted. Unfortunately, however, in this case I am constrained by the record to conclude that the IJ did not commit the legal error Petitioners claim. In rendering her decision, the IJ explained

> *[E]ven if [Jose] did mention the fact that this sister was instrumental in him being deported* . . . that was not the reason for his aggressive behavior. Again, he never bothered one of his sister's children, and he bothered a whole lot of other people who were not his sister's children. And it all seemed to be triggered when he was drunk, under the influence of alcohol, or because of his mental health issues.

J.A. 94–95 (emphasis supplied).[1] Despite its brevity, this passage demonstrates that the IJ considered other possible reasons for Jose's persecution of Petitioners. And, while the IJ considered the other possible reasons, the IJ determined -- as a factual matter -- that Jose's central motivation for his aggression was only his alcohol and mental health issues. *See Perez Vasquez*, 4 F.4th at 221 ("[A] persecutor's motivation is a classic factual question reviewed for substantial evidence." (internal quotation marks omitted)).

Because the IJ did consider the possibility of other, intertwined reasons for Jose's persecution, I conclude that there was no legal error. And, upon review of the IJ's factual findings for substantial evidence, I concur.

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

26