**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 24-1842**

─────────────

CARLOS ANDRES RAMOS MARQUEZ,

Petitioner,

v.

PAMELA JO BONDI, Attorney General,

Respondent.

─────────────

On Petition for Review of an Order of the Board of Immigration Appeals.

─────────────

Argued: September 11, 2025                    Decided: November 19, 2025

─────────────

Before WILKINSON, GREGORY and THACKER, Circuit Judges.

─────────────

Petition for review granted; vacated and remanded by published opinion. Judge Thacker wrote the opinion, in which Judge Gregory joined. Judge Wilkinson wrote a dissenting opinion.

─────────────

**ARGUED:** Madeline Nita Taylor Diaz, Katherine Ann Soltis, TAYLOR DIAZ & SOLTIS PLLC, Falls Church, Virginia, for Petitioner. Blair Timothy O'Connor, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Brian M. Boynton, Principal Deputy Assistant Attorney General, Erica B. Miles, Assistant Director, A. Ashley Arthur, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

─────────────

THACKER, Circuit Judge:

Carlos Ramos Marquez ("Petitioner") seeks review of the Board of Immigration Appeals' ("BIA") denial of his application for withholding of removal and protection pursuant to the Convention Against Torture ("CAT"). We conclude that the Immigration Judge ("IJ") disregarded credible evidence in the record without explanation, and that the BIA failed to correct that error. As to withholding of removal, the record compels us to conclude that Petitioner sufficiently demonstrated that Honduras is unable or unwilling to control the MS-13[1] gang, reporting his past persecution to Honduran authorities would have been futile or subjected Petitioner to further harm, and he could not have relocated to avoid persecution. As to protection pursuant to the CAT, we conclude that the BIA improperly disregarded credible evidence in the record which supported Petitioner's contention that Honduras would acquiesce in his torture if he were returned to the country.

Therefore, we grant the petition for review, vacate the BIA's decision, and remand for further proceedings consistent with this opinion.

I.

Petitioner, a native and citizen of Honduras, entered the United States without inspection or authorization on or about May 10, 2019. Petitioner claims that while he was in Honduras, he suffered persecution by members of MS-13, and he claims there is a clear

---

[1] "La Mara Salvatrucha, otherwise known as MS–13, is one of the largest and most violent street gangs in the United States. The gang originated in Los Angeles, California in the 1980s. Since then, it has spread across the country and into foreign countries such as El Salvador, Honduras, and Mexico." *United States v. Ayala*, 601 F.3d 256, 261 (4th Cir. 2010).

probability that he would be persecuted or tortured by MS-13 if he were to return to Honduras.

A.

In 2014 or 2015, Petitioner's brother, Jose Guzman, was tortured and killed by MS-13 members in Progreso, Yoro, Honduras.[2]  Police responded to the scene of the murder, but no arrests were ever made.

Several years later, Petitioner and another brother of his, Jose Santos Marquez ("Marquez"), began having their own problems with MS-13.  Marquez opened a produce business in Cortes, Honduras, and Petitioner worked there with him.  In 2018, MS-13 members went to the produce store while Petitioner was working alone and demanded to speak to Marquez.  Petitioner told them Marquez was not there, and the gang members said they would return later.  When the gang members returned the following day, they demanded that Marquez pay them 600 lempiras, which equates to roughly $25.  Marquez told them he could not afford to pay, and the gang members responded that "if he didn't, he knew what would happen."  J.A. 394.[3]  Rather than pay the extortion demand, Marquez closed his shop and moved to a different town.  According to Petitioner, "[o]nce the gang members learned that the business had been closed, they started problems with" Petitioner. *Id.* at 106.

---

[2] Petitioner concedes that incident was unrelated to the problems he subsequently had with MS-13, which cause him to fear returning to Honduras.

[3] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

3

In June 2018, three armed MS-13 members approached Petitioner at a street fair, which was somewhere between 15 and 30 minutes away from the location of the produce business, and asked him why Marquez had closed the business. The gang members demanded Marquez's phone number, but Petitioner told them he did not know where Marquez was or have his number. The gang members then demanded that Petitioner pay off his brother's debt by working for them, but Petitioner refused. In response, a gang member pushed Petitioner down and kicked his face, pushing his face into the rocks. Petitioner's right eye and the side of his nose were injured. Afterward, Petitioner went to his sister's home in El Calán, Villanueva, Cortes and sought medical assistance at a clinic. He did not report the incident to police.

After the incident at the fair, Petitioner moved into his sister's home, which was about thirty minutes away from the area of Cortes where Petitioner had been living and working. Several months later, Petitioner was approached by a different MS-13 member when he was working as a security guard. The gang member told Petitioner he liked his weapon and proposed that they perform a fake robbery so that the gang member could acquire the weapon from Petitioner. Petitioner refused.

In December 2018, MS-13 members approached Petitioner again and asked why he had refused them twice before. The gang members told Petitioner that he had to either give up his brother Marquez or work for them. When Petitioner again refused, the gang members told Petitioner to kneel on the ground at which point they put a gun to his head. The gang members said that they "governed" the entire country and "wherever [Petitioner] went, they would find [him and his brother] and kill [them]." J.A. 109; *see also id.* at 395.

4

The gang members hit Petitioner on the head with the gun, and he lost consciousness. Petitioner did not report this incident to police. After this, Petitioner stayed inside his sister's house to avoid the gangs. Petitioner ultimately fled to the United States in April 2019.

In 2020, while Petitioner was living in the United States, gang members "would send [him Facebook] messages asking [him] to send them money, but [he] didn't pay attention to them." J.A. 113. In addition, gang members continued to search for Marquez after Petitioner fled Honduras. Marquez eventually opened a new business in Choloma, Cortez. But in August 2021, Marquez was murdered by five MS-13 members. Marquez's wife witnessed the murder and called the police. Police responded to the scene of the crime and took a report, but no arrests were ever made.

According to Petitioner's sister, MS-13 members also went to her house to look for Petitioner after he fled to the United States, and they threatened her. She filed a police report in July 2022, and then fled to the United States herself. According to Petitioner's sister, "[t]he gangs are always waiting for [Petitioner] because even when I went to file a complaint with the police, the gangs told me they would always be waiting for him and would continue to look for him." J.A. 399.

B.

Petitioner unlawfully entered the United States in May 2019, and the Department of Homeland Security issued the operative Notice to Appear and initiated removal proceedings on September 22, 2023. Petitioner conceded removability but filed requests for withholding of removal and protection pursuant to the CAT.

5

1.

During the merits hearing before the IJ, Petitioner testified to the facts laid out above. He explained that he did not report his MS-13 encounters to police because "the government is corrupt" and "won't protect [him]." J.A. 117. He explained that "the gangs . . . learn somehow when you file a report, and that's why we're afraid to report them." *Id.* at 115. In his view, gangs "investigate [people] even better than the authorities do." *Id.* at 116–17. In support of his applications for relief, Petitioner submitted various exhibits including an affidavit from his sister, a copy of the police report she filed, and the death certificate for his brother Marquez. Petitioner also submitted country condition evidence which he argued demonstrated that the Honduran government was unable or unwilling to control MS-13 and that MS-13 operated all across Honduras. The IJ found Petitioner credible but denied his requests for withholding and CAT relief.

As to withholding, the IJ determined that Petitioner had been persecuted by MS-13 in the past, and that the persecution was on account of Petitioner's membership in the particular social group ("PSG") of immediate family members of Marquez. But the IJ concluded that the persecution Petitioner suffered did not meet the legal definition of "past persecution" because Petitioner failed to demonstrate that the Honduran government was "unwilling or unable" to control MS-13. J.A. 64–65.

In reaching this conclusion, the IJ emphasized that Petitioner's country condition evidence indicated that "violence, criminal groups, and corruption are a general problem throughout Honduras, but this alone is insufficient to establish" the "unable or unwilling" prong. J.A. 65. The IJ also pointed out that the country condition evidence demonstrated

6

that the Honduran "state of exception," which the Honduran government enacted in December 2022 "to combat gangs and extortion" "has resulted in some arrests and forced the gangs to keep a lower profile." *Id.* In addition, the IJ noted that Petitioner failed to report his persecution to Honduran authorities, and that the police had responded when they were called to the scenes of his brothers' murders. Thus, the IJ determined that Petitioner's "personal experiences with the Honduran police establish the government's willingness and ability." *Id.*

Additionally, the IJ concluded that Petitioner had not demonstrated that he "could not reasonably relocate to avoid future persecution" because all of his encounters with MS-13 occurred in Cortes and he never attempted to relocate outside of Cortes. J.A. 65. The IJ "acknowledge[d] [Petitioner's] testimony and generalized country conditions evidence indicating Honduras issues with gangs, violence, and corruption," but concluded that, "without more, this assertion of generalized gang presence and corruption [was] insufficient." *Id.*

As to Petitioner's request for CAT relief, the IJ determined that Petitioner had not demonstrated it was "more likely than not that anyone in Honduras would torture him," even considering the "aggregated . . . potential risks." J.A. 66. The IJ first determined that Petitioner's prior persecution by MS-13 did not rise to the level of torture. And, even when the IJ assumed it amounted to torture, the IJ determined that there was no presumption of future torture because (1) Petitioner had not been in Honduras since 2019; (2) "[t]here is nothing in the record to indicate that the same MS-13 gang members are looking for [Petitioner] or [are] even still in Honduras"; (3) all of the prior gang activity occurred in

7

Cortes; and (4) "[t]here is no evidence that the MS-13 or anyone else in Honduras has been looking for him since his departure from that country, has attempted to communicate [with] him, or has approached anyone in Honduras whom he knows to ascertain his location, acquire his contact information, or convey messages to him." *Id.* at 67. This, combined with the generalized country condition evidence, led the IJ to conclude that any risk of future torture was "speculative." *Id.*

Finally, the IJ concluded that Petitioner failed to demonstrate that any future torture would be a "by, at the instigation of, or with the acquiescence of a public official." J.A. 67. The IJ noted that torture and corruption are illegal in Honduras, and she explained her view that Petitioner's claims of government collusion with the gangs were "indistinguishable from mere dissatisfaction with the police's good-faith efforts in handling a criminal case with veritable challenges." *Id.* Additionally, the IJ noted that the state of exception demonstrated that the Honduran government would not consent or acquiesce to torture. *Id.*

2.

Petitioner appealed the IJ's ruling to the BIA. In an opinion by a single board member, the BIA found no clear error in the IJ's decision.

As to withholding of removal, the BIA found no clear error in the IJ's determination that the Honduran government was not unable or unwilling to control MS-13. The BIA explained that the IJ had sufficiently "analyzed the Honduran government's past and future ability and willingness to control the respondent's alleged persecutors, considering the respondent's testimony and relevant evidence of record." J.A. 4. Specifically, the BIA

8

determined that while Petitioner was not required to report his past harm to the police, he had failed to demonstrate that reporting would have been futile or subject him to further harm -- a finding the IJ did not explicitly make below.  The BIA, like the IJ, noted that the police responded when they were called to Petitioner's brothers' murders and when they were called by Petitioner's sister.  The BIA also noted that the county condition evidence "indicated that the Honduran government has taken measures to combat gang violence," such that the IJ did not clearly err in her "unable or unwilling" analysis.  *Id.*

The BIA also determined that the IJ did not clearly err when she held that Petitioner had failed to demonstrate he could not reasonably relocate to avoid future persecution.  The BIA explained that, contrary to Petitioner's assertions, the IJ did not improperly place the burden on Petitioner to demonstrate the unreasonableness of relocation.  Instead, the BIA explained that "[b]ecause [Petitioner] did not establish that the Honduran authorities were unable or unwilling to protect him, he did not establish past persecution such that he is entitled to a presumption of a well-founded fear of future persecution."  J.A. 5.  And on the merits of the IJ's relocation analysis, the BIA found no clear error because Petitioner had only encountered MS-13 in Cortes and had not tried to relocate, and the BIA agreed that Petitioner's belief about corruption was insufficient alone to meet his burden.

Because those holdings were dispositive of Petitioner's request for withholding of removal, the BIA declined to address his other arguments on that issue.

As to Petitioner's request for CAT relief, the BIA discerned no clear factual or legal error in the IJ's conclusion that Petitioner "did not present sufficient evidence to establish that Honduran authorities would consent or acquiesce to his torture."  J.A. 5.  The BIA

9

emphasized that the country condition evidence indicated the Honduran government was working to combat gang activity, and it noted that the police responded to Petitioner's brother's murders. "While the police investigations may have been unsuccessful, police ineffectiveness is not sufficient to establish acquiescence." *Id.* The BIA also concluded, contrary to Petitioner's assertion otherwise, that the IJ meaningfully considered the country condition evidence and was "not required to discuss every piece of evidence in the record." *Id.* at 6.

The BIA affirmed the IJ's decision and dismissed the appeal. Petitioner timely filed this request for review.

## II.

"'When, as here, the BIA affirms the IJ's decision with an opinion of its own, we review both decisions.'" *Garcia Hernandez v. Garland*, 27 F.4th 263, 266 n.* (4th Cir. 2022) (quoting *Salgado-Sosa v. Sessions*, 882 F.3d 451, 456 (4th Cir. 2018)). Nonetheless, our review is limited to "[t]he grounds upon which the . . . [BIA's] action was based." *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943).

The BIA's legal conclusions are reviewed de novo, and factual findings are reviewed for substantial evidence. *Garcia Hernandez*, 27 F.4th at 268. Under the substantial evidence standard, "even if the record plausibly could support two results: the one the IJ chose and the one the petitioner advances, reversal is only appropriate where the court finds that the evidence not only supports the opposite conclusion, but compels it." *Tang v. Lynch*, 840 F.3d 176, 180 (4th Cir. 2016) (cleaned up). In other words, we must

uphold the IJ's decision unless the record is so compelling that "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B)).

Importantly, when "reviewing agency decisions in immigration matters, it is our responsibility to ensure that unrebutted, legally significant evidence is not arbitrarily ignored by the factfinder." *Hernandez-Cartagena v. Barr*, 977 F.3d 316, 320–21 (4th Cir. 2020) (internal quotation marks and citation omitted). Thus, "[t]he agency 'is not entitled to base a decision on only isolated snippets of the record while disregarding the rest.'" *Id.* at 321 (quoting *Tassi v. Holder*, 660 F.3d 710, 719 (4th Cir. 2011)). And "an IJ is not entitled to ignore an . . . applicant's testimony in making . . . factual findings." *Hernandez-Avalos v. Lynch*, 784 F.3d 944, 951 (4th Cir. 2015). The agency "abuses its discretion if it fails to offer a reasoned explanation for its decision, or if it distorts or disregards important aspects of the applicant's claim." *Orellana v. Barr*, 925 F.3d 145, 151 (4th Cir. 2019) (cleaned up). And "[w]e may also overturn the BIA's determinations if we conclude that the BIA abused its discretion." *Rodriguez-Arias v. Whitaker*, 915 F.3d 968, 972 (4th Cir. 2019) (citing *Tassi*, 660 F.3d at 719).[4]

---

[4] While the dissent takes issue with this standard, *see Post* at 32 –33, we -- as a panel of this court -- are bound to faithfully apply our precedent. *See McMellon v. United States*, 387 F.3d 329, 332 (4th Cir. 2004) (noting the "basic principle that one panel cannot overrule a decision issued by another panel"); *see also Payne v. Taslimi*, 998 F.3d 648, 654 (4th Cir. 2021) (same). And the applicable standard is plainly long standing precedent of this court.

III.

A.

Withholding of Removal

Petitioner first challenges the BIA's denial of his request for withholding of removal.

To qualify for withholding of removal, a noncitizen must demonstrate a clear probability that, if removed to a particular country, his "life or freedom would be threatened in that country because of [his] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). In other words, the noncitizen "must face a clear probability of persecution in the country of removal" on account of a protected factor. *Lopez Ordonez v. Barr*, 956 F.3d 238, 241 (4th Cir. 2020). Proof of past persecution in the proposed country of removal entitles the applicant to a rebuttable presumption that his life or freedom would be threatened. *See* 8 C.F.R. § 1208.16(b)(1)(i). This rebuttable presumption can be overcome by the Government if the preponderance of the evidence demonstrates there has been "a fundamental change in circumstances such that the applicant's life or freedom" would no longer be threatened or that the applicant could avoid future harm "by relocating to another part of the proposed country of removal." *Id.* at § 1208.16(b)(1)(i)(A)–(B). Absent a showing of past persecution, the applicant must establish that "it is more likely than not that he or she would be persecuted" on account of a protected ground. *Id.* at § 1208.16(b)(2). If the applicant could avoid persecution by relocating within his country, and if relocation would be reasonable under all the circumstances, the applicant cannot establish a clear probability of future persecution. *Id.*

12

The BIA denied Peitioner's application for withholding of removal because it determined that he had not been subject to past persecution by an entity Honduras was "unable or unwilling" to control, and because it concluded that Petitioner had not demonstrated that he could not reasonably relocate to avoid future persecution. We address each ground in turn.

1.

Unable or Unwilling

a.

"When an applicant claims that []he fears persecution by a private actor, []he must also show that the government in [his] native country 'is unable or unwilling to control' [his] persecutor." *Orellana v. Barr*, 925 F.3d 145, 151 (4th Cir. 2019) (quoting *Hernandez-Avalos v. Lynch*, 784 F.3d 944, 949 (4th Cir. 2015)). "Whether a government is unable or unwilling to control a private actor is a factual question that must be resolved based on the record in each case." *Orellana*, 925 F.3d at 151 (cleaned up). "Purported [government] efforts to combat gang violence and corruption in general do not excuse the agency's failure to support its decision with the proper legal and factual analysis of Petitioner's *specific* circumstances." *Portillo Flores v. Garland*, 3 F.4th 615, 635 (4th Cir. 2021) (en banc) (emphasis in original). And, generally, "[e]vidence of empty or token 'assistance' cannot serve as the basis of a finding that a foreign government is willing and able to protect." *Orellana*, 925 F.3d at 153.

While there is not a per se requirement that an applicant have reported his past persecution to police, we have held that "an applicant who relinquishes a protective process

13

without good reason will generally be unable to prove his government's unwillingness or inability to protect him." *Portillo Flores*, 3 F.4th at 635 (cleaned up). Nevertheless, "there is no requirement that an applicant persist in seeking government assistance when doing so (1) would have been futile or (2) have subjected [him] to further abuse." *Orellana*, 925 F.3d at 153 (cleaned up).[5]

b.

As explained above, the IJ determined that Petitioner failed to demonstrate that the Honduran government was unable or unwilling to protect him because (1) Petitioner failed to report his past encounters with MS-13 to police, (2) police responded to the scenes of his brothers' murders, and (3) the state of exception had resulted in "some arrests and forced the gangs to keep a lower profile." J.A. 65. The BIA discerned no clear error in that analysis, and it repeated the IJ's rationale that Petitioner had never reported his past harms but that police had responded when called to the murder scenes. In fact, in regard to Marquez's murder, the BIA thought it notable that "not only did [the police] arrive but they took photos and interviewed witnesses." *Id.* at 4. In other words, the IJ and the BIA each found that Honduras was willing and able to protect Petitioner based almost exclusively on evidence that the Honduran police respond to murder scenes.

---

[5] Despite its purported recognition that we have long rejected a per se reporting requirement, the dissent nonetheless seeks to impose one. *See* Post at 28–30 (focusing on "the consistent failure of Ramos Marquez to report offenses to the police"). Our precedent squarely forecloses such a requirement. And for good reason. As the evidence here demonstrates, reporting to Honduran authorities would have been futile, at best, or subjected Petitioner to even further harm, at worst. Petitioner need not have taken that risk to secure relief here.

14

In reaching this conclusion, the IJ and the BIA did the exact thing we have cautioned them **not to do** -- they ignored Petitioner's credible, unrebutted, legally significant testimony that reporting to police would have resulted in more harm, and cherry-picked evidence from the record to support its contrary conclusion.

Neither the IJ nor the BIA considered Petitioner's testimony that he did not report his gang encounters because the government is corrupt, and the gangs find out when someone reports them. This credible testimony was supported by the country condition evidence Petitioner submitted which indicated that "[i]t is widely recognized that the Honduran government – including the police, military, and judicial system – is crippled by severe corruption. Lawlessness and impunity is widespread." J.A. 757; *see also id.* at 570 (explaining "high-ranking police, judicial, and other government officials in El Salvador, Guatemala, and Honduras have acknowledged to the author that their governments are unable to control gangs or to protect the public."). The IJ and the BIA ignored that evidence and failed to offer "specific, cogent reasons" for doing so. *Portillo Flores*, 3 F.4th at 636 ("[W]e conclude that when disregarding credible, significant, and unrebutted evidence, agency adjudicators must offer specific, cogent reasons for doing so." (cleaned up)).

Instead, the agency focused only on the fact that the police responded to the murders of Petitioner's brothers -- as if that demonstrates the government has the ability and willingness to control MS-13. As we have explained, "[e]vidence of empty or token 'assistance' cannot serve as the basis of a finding that a foreign government is willing and able to protect" an applicant. *Orellana*, 925 F.3d at 153. While it is true that the police responded to those murder scenes, that says nothing about whether the police would be

15

able to control MS-13 *before* they murder Petitioner.  They certainly were unable to control MS-13 before they murdered both of Petitioner's brothers.

Petitioner was "entitled to know that agency adjudicators reviewed all [his] evidence, understood it, and had a cogent, articulable basis for its determination that [his] evidence was insufficient."  *Orellana*, 925 F.3d at 153 (internal quotation marks and citation omitted).  Neither the IJ nor the BIA provided that here.  Therefore, we conclude that the agency abused its discretion, and we vacate the BIA's determination that Petitioner failed to demonstrate past persecution by an entity the Honduran Government was unable or unwilling to control.

c.

What is more, the record here compels the conclusion that Petitioner did sufficiently demonstrate that Honduras was unable or unwilling to control MS-13.  As explained, there is no requirement that an applicant for withholding of removal have reported his past harm to police, so long as the applicant demonstrates that "doing so (1) would have been futile or (2) have subjected [him] to further abuse."  *Orellana*, 925 F.3d at 153 (cleaned up).  The record evidence demonstrated both of those.

First, the only evidence of police involvement amounted to no more than "empty or token assistance," which this court has explained "cannot serve as the basis of a finding that a foreign government is willing and able to protect an [applicant]."  *Orellana*, 925 F.3d at 153.  Here, the only record evidence was that police responded to the scenes after Petitioner's brothers' murders, interviewed witnesses and took photographs at one of those scenes, and took a report from Petitioner's sister after the gang threatened her.  Petitioner

16

testified that the police had done nothing to investigate either of the murders or his sister's report, and that no arrests had been made in any of those cases. Thus, the evidence demonstrated that reporting would have been futile because it would have resulted in only empty or token assistance.

In addition, Petitioner's credible, unrebutted testimony was that he did not report his persecution by MS-13 because "the government is corrupt" and "won't protect [him]." J.A. 117. He explained, "the gangs . . . learn somehow when you file a report, and that's why we're afraid to report them." *Id.* at 115. Indeed, Petitioner's sister' averred that "[t]he gangs are always waiting for [Petitioner] because even when I went to file a complaint with the police, the gangs told me they would always be waiting for him and would continue to look for him." *Id.* at 399. The country condition evidence Petitioner submitted provided support for these contentions. Thus, the credible, unrebutted evidence demonstrated that Petitioner would have been subject to more harm had he reported the threats to the Honduran authorities.

d.

In sum, we conclude that the agency abused its discretion when it ignored credible, unrebutted, and legally significant evidence in the record and instead concluded that Petitioner failed to demonstrate that Honduras is unable or unwilling to control MS-13. We also conclude that the record evidence compels the conclusion that Petitioner made the requisite showing because he demonstrated that reporting to police would have been futile or resulted in more harm. To the extent the IJ and the BIA relied on the fact that the Honduran "state of exception" has resulted in "some arrests" to support its contrary

17

conclusion, J.A. 65, we note that "[p]urported [government] efforts to combat gang violence and corruption in general do not excuse the agency's failure to support its decision with the proper legal and factual analysis of Petitioner's *specific* circumstances." *Portillo Flores*, 3 F.4th at 635 (emphasis in original).

### 2.

### Relocation

In addition to its conclusion on the unable or unwilling prong, the BIA also denied Petitoner's application for withholding of removal because it concluded that he failed to demonstrate that he could not reasonably relocate within Honduras to avoid persecution.

An applicant "cannot demonstrate that his or her life or freedom would be threatened [upon removal] if . . . the applicant could avoid [persecution] by relocating to another part of the proposed country of removal and, under all the circumstances, it would be reasonable to expect the applicant to do so." 8 C.F.R. § 1208.16(b)(2). Absent proof of past persecution, the noncitizen bears the burden of proving that it would not be reasonable for him to relocate, unless the persecution is by a government or is government sponsored. *Id.* § 1208.16(b)(3)(i)–(ii). But if the applicant has demonstrated past persecution by an actor the government is unable or unwilling to control, then the Government -- not Petitioner -- bears the burden on the relocation analysis. *Id.* § 1208.16(b)(1)(ii).

As the IJ found, Petitioner "established he suffered harm that rises to the level of persecution." J.A. 61. Yet, there is no dispute that the agency placed the burden on Petitioner because it concluded that he had not demonstrated past persecution *by an actor Honduras was unable or unwilling to control*. Because we conclude that the agency abused

18

its discretion in reaching that holding, and that the record compels the conclusion that Honduras is unable or unwilling to control MS-13, we agree with Petitioner that the BIA erred in placing the burden on him. Therefore, we vacate the BIA's decision on this issue and remand for reconsideration using the correct framework.

To be clear, the correct framework is as follows. Petitioner demonstrated that he suffered past persecution, so he is entitled to a rebuttable presumption that his life or freedom would be threatened if he returned to Honduras. *See* 8 C.F.R. § 1208.16(b)(1)(i). This rebuttable presumption can be overcome by the Government if the preponderance of the evidence demonstrates there has been "a fundamental change in circumstances such that the applicant's life or freedom" would no longer be threatened or the applicant could avoid future harm "by relocating to another part of the proposed country of removal." 8 C.F.R. § 1208.16(b)(1)(i). Because the agency improperly placed the burden, it did not consider whether the Government demonstrated any fundamental change in circumstances sufficient to conclude that Petitioner's life or freedom would no longer be threatened.

But, despite its misplaced burden, the agency did consider whether Petitioner could relocate to avoid persecution and concluded that he could. While the agency must properly reconsider the relocation analysis on remand, we note that the IJ and the BIA inexplicably failed to consider Petitioner's credible, unrebutted testimony on this issue as well. In particular, Petitioner explicitly testified that MS-13 members told him they "governed" the entire country and "wherever [he] went, they would find [him and his brother] and kill [them]." J.A. 109. Indeed, when Petitioner moved in with his sister in another area of Cortes, MS-13 found him. And even when Petitioner fled to the United States, MS-13

19

members continued to search for him and "would send [him Facebook] messages asking [him] to send them money, but [he] didn't pay attention to them." *Id.* at 113.[6]  Petitioner supported this testimony by submitting country condition evidence that "a strategy of internal relocation [is] implausible and, depending on the situation, even impossible simply because those they are fleeing learn of their whereabouts." *Id.* at 575.  The IJ and the BIA failed to consider any of this evidence or provide any cogent reasons for disregarding it.  Upon our review, we fail to see how the record demonstrates that Petitioner could relocate to avoid future persecution.

B.

CAT Relief

Petitioner next challenges the BIA's denial of his request for protection pursuant to the CAT.

To receive protection pursuant to the CAT, an applicant must "establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal."  8 C.F.R. § 1208.16(c)(2).  The burden of proof rests with the applicant.  *Id.* For purposes of the CAT, torture includes only conduct "by, or at the instigation of, or with the consent or acquiescence of, a public official or other person acting in an official capacity."  8 C.F.R. § 1208.18(a).  "A public official acquiesces to torture if, prior to the activity constituting torture, the official has awareness of such activity and thereafter

---

[6] This testimony if further supported by the fact that MS-13 continued searching for Marquez after he fled and ultimately found and murdered him more than three years later in 2021.

20

breaches his or her legal responsibility to intervene to prevent such activity." *Lizama v. Holder*, 629 F.3d 440, 449 (4th Cir. 2011) (cleaned up) (quoting 8 C.F.R. § 1208.18(a)(7)). The official or officials "need not have actual knowledge of the torture; it is enough if they simply turn a blind eye to it." *Cabrera Vasquez v. Barr*, 919 F.3d 218, 222 (4th Cir. 2019) (cleaned up).

The IJ determined that Petitioner's past persecution did not rise to the level of torture and that Petitioner had not demonstrated a probability of future torture. The IJ also concluded that Honduras would not acquiesce to Petitioner's torture in any event. The BIA did not address the probability of future torture.[7] Instead, the BIA affirmed the IJ's denial of CAT relief only on the acquiescence prong. The BIA explained that the IJ did not clearly err because she

> considered country condition evidence and noted the efforts Honduran authorities have made to combat gang violence. The [IJ] also noted that the police did in fact respond when they were called to the scene of [Petitioner's] brothers' murders . . . . While the police investigations may have been unsuccessful, police ineffectiveness is not sufficient to establish acquiescence.

J.A. 5 (internal citations omitted).

Petitioner argues that the BIA (1) erred in relying on the fact that torture and corruption are illegal in Honduras, (2) was incorrect to consider the fact that he did not report his incidents to police, and (3) erred in concluding that his assertions about

---

[7] Therefore, that issue is not before us in this petition for review. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) (explaining the court's review is limited to "[t]he grounds upon which . . . [the agency's] action was based").

21

corruption are indistinguishable from mere dissatisfaction with the police's good faith efforts at handling cases. Petitioner argues that he submitted numerous country condition reports that demonstrate that the Honduran government is corrupt, colludes with gangs, and turns a blind eye to torture. But, he asserts that the agency failed to meaningfully engage with that evidence. We agree.

Like withholding of removal, "[i]t is an abuse of discretion for the BIA or IJ to arbitrarily ignore relevant evidence" in considering an application for CAT relief. *Rodriguez-Arias v. Whitaker*, 915 F.3d 968, 974 (4th Cir. 2019) (citation omitted). Hence, a wholesale "failure by the IJ and BIA to consider evidence of country conditions constitutes reversible error." *Id.* (cleaned up). This is especially true in the CAT context where "country conditions alone can play a decisive role in granting relief under the CAT." *Id.* (cleaned up). Petitioner's country condition evidence of Honduran acquiescence to torture was plentiful. *See* J.A. 568 (noting that "[t]he state, and in particular police, organize and/or tolerate 'Death Squads' that operate under schemes of enforced disappearances and extrajudicial execution similar to those applied during the 1980s, which existed as part of a 'social cleansing' campaign," and observing the high numbers of extrajudicial killings committed by security forces in Honduras); *id.* at 606 (noting that the U.S. Department of State reports "significant human rights issues includ[ing] credible reports of: unlawful or arbitrary killings, including extrajudicial killings; torture and cases of cruel, inhuman, or degrading treatment or punishment by government agents; […] serious government corruption"); *id.* at 566 (explaining that gangs often "negotiate with governmental representatives" and "operate in direct collusion with

22

corrupt state officials"); *id.* at 782 (observing an internal investigation found that 81 Honduran police officers worked for MS-13 and committed violent crimes for the gang, including the massacre of 12 people); *id.* at 799 (explaining the state of exception "has done little to reduce criminal activity in the country"); and *id.* at 800 (noting that "incongruities between data from the police and the report [from the National Commission on Human Rights] have created doubt around how effective the state of exception has actually been in the fight against organized crime"). Even country condition evidence submitted by the Government indicated that the United States Department of Justice recently indicted the former president of Honduras, alleging that he "partnered with some of the world's most prolific narcotics traffickers to build a corrupt and brutally violent empire." *Id.* at 283.

But both the IJ and the BIA failed to address this evidence. Instead, the IJ simply noted that torture is illegal in Honduras. And while the IJ "acknowledge[d] the record evidence suggests that corruption and violence remain widespread problems in Honduras," she concluded that "there is insufficient evidence in the record to establish that officials would . . . acquiesce or consent to any torture." J.A. 67. The BIA did not correct this error. It only noted that the IJ had considered the country condition evidence, and then again pointed out that the police had responded to the murder scenes. The BIA concluded that Petitioner's claims about the police "do[ing] nothing" were nothing more than dissatisfaction with "police ineffectiveness." *Id.* at 5.

Here too, the agency disregarded and failed to meaningfully engage with record evidence. It "selectively consider[ed] evidence, ignoring that evidence that corroborates

23

[Petitioner's] claims and calls into question the conclusion the judge [was] attempting to reach." *Ai Hua Chen v. Holder*, 742 F.3d 171, 179 (4th Cir. 2014). Thus, the agency abused its discretion in denying Petitioner's application for CAT relief, and we vacate its decision.[8]

IV.

In sum, we vacate the BIA's determination that Petitioner failed to demonstrate the Honduran government was unable or unwilling to control MS-13 and conclude that the record compels the opposite conclusion.

Because Petitioner demonstrated that he has suffered past persecution by an actor Honduras is unable or unable to control, Petitioner is entitled to a presumption of future persecution. On remand, the Government can overcome that presumption if it can demonstrate by a preponderance of the evidence that there has been "a fundamental change in circumstances such that the applicant's life or freedom" would no longer be threatened or that the applicant could avoid future harm "by relocating to another part of the proposed country of removal." 8 C.F.R. § 1208.16(b)(1)(i). But on this record, we conclude that the evidence compels the conclusion that Petitioner could not avoid future persecution by relocating.

---

[8] By pointing to country condition evidence favorable to Petitioner, we do not reweigh the evidence as the dissent suggests. *See Post* at 31. We merely point to evidence the IJ and the BIA completely ignored without explanation. It is up to the agency to consider that evidence on remand or cogently explain why it does not find it persuasive. *See Portillo Flores*, 3 F.4th at 636.

24

As to Petitioner's application for CAT relief, we conclude that the agency abused its discretion by failing to meaningfully engage with Petitioner's country condition evidence supporting his claim that the Honduran government would acquiescence to his torture. The agency must do so on remand.

*PETITION FOR REVIEW GRANTED*;
*VACATED AND REMANDED*

WILKINSON, Circuit Judge, dissenting:

I would deny the petition for review. To have even a decent chance at success, investigations of violent crimes require cooperation between law enforcement, victims, and third-party eyewitnesses. Yet Carlos Ramos Marquez never once notified Honduran officials about the harm he purportedly suffered, even though they had always looked into alleged crimes that his relatives reported. We can thus hardly fault the Honduran police for coming up short.

In holding otherwise, my able colleagues in the majority disregard the inherently collaborative nature of criminal investigations and dilute the deference that we, by statute, owe the judges below.

I.

"[A]dministrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). This court can only say so many times and in so many words that the bar needed to "compel[]" a "contrary" factual conclusion is a lofty one. We cannot "reweigh the evidence." *Gonahasa v. INS*, 181 F.3d 538, 542 (4th Cir. 1999). And when "the record plausibly could support two results—the one the agency chose and the one the petitioner advances—we must defer to the agency." *Diaz-Hernandez v. Garland*, 104 F.4th 465, 472 (4th Cir. 2024) (quoting *Madrid-Montoya v. Garland*, 52 F.4th 175, 179–80 (4th Cir. 2022)). In a nutshell, this framework—substantial-evidence review—is "highly deferential." *Nasrallah v. Barr*, 140 S. Ct. 1683, 1692 (2020). Through it, Congress evinced faith in the subject-matter expertise of Immigration Judges ("IJs") and the Board of Immigration Appeals ("BIA").

26

The majority has ignored our precedent and, indeed, the entire framework under which these claims of deportation relief should be reviewed. Purporting to heed the deference due the primary adjudicators in this field, the majority simply comes to its own conclusions. In so doing, it recites substantial-evidence review but proceeds to cherry-pick facts and rebalance evidence according to its preferences. With all respect to my friends in the majority, standards of review should not begin and end with lip service. By declining to credit the agency's factual determinations, the majority does a disservice to the Immigration and Nationality Act's ("INA's") scheme of adjudication.

A.

For statutory withholding of removal, Ramos Marquez must establish a "clear probability of persecution." *INS v. Stevic*, 467 U.S. 407, 430 (1984). One way to do so involves showing, among other things, that Honduras was "unable or unwilling to control" the gang members that Ramos Marquez fears. *Garcia v. Garland*, 73 F.4th 219, 229 (4th Cir. 2023). Likewise, for relief under the Convention Against Torture ("CAT"), he must prove it is "more likely than not" that Honduran officials will "consent" to or "acquiesce" in his future "severe pain or suffering." 8 C.F.R. §§ 1208.16(c)(2), 1208.18(a)(1). As part of this element, the Honduran government must be "aware[]" of the torturous conduct and "thereafter breach [its] legal responsibility to intervene to prevent such activity." *Id.* § 1208.18(a)(7).

Substantial evidence supports the IJ's and BIA's finding that Ramos Marquez comes up short on all these fronts. Consider first his limited, if not nonexistent, interactions with Honduran officials: When three MS-13 members allegedly threatened one of his

27

brothers for failing to pay an alleged debt, did anyone report their extortion to the police? No. J.A. 178. When those men later allegedly assaulted Ramos Marquez for refusing to join MS-13, was law enforcement notified then? Still no. J.A. 179. What about when the same trio allegedly demanded he join MS-13 and aimed a gun at his head while threatening to kill both him and his brother? No again. J.A. 179–80. And what about when an MS-13 member allegedly suggested staging a robbery so he could take Ramos Marquez's weapon? Once more, no. J.A. 176–77.

Law enforcement is ordinarily a reciprocal enterprise. Authorities depend on victims and eyewitnesses to report and testify to the crimes that they experience or observe. This holds particularly true for offenses in which the primary incriminating evidence is either spoken word or physical injuries, such as the extortion, threats, and assaults that Ramos Marquez claims he suffered. But because he did not report these incidents, law enforcement never had the opportunity to seek recourse. It was left in the dark. For all we know, Honduran officials could have been willing and able to stop the treachery of Ramos Marquez's purported assailants if he simply brought the issue to their attention. Yet he did not.

I acknowledge that this court has rejected a per se reporting requirement, instead permitting each petitioner to show that seeking governmental assistance "(1) 'would have been futile' or (2) [would] 'have subjected [him] to further abuse.'" *Orellana v. Barr*, 925 F.3d 145, 153 (4th Cir. 2019) (quoting *Ornelas-Chavez v. Gonzales*, 458 F.3d 1052, 1058 (9th Cir. 2006)). And I recognize that Ramos Marquez, whom the IJ deemed credible, J.A.

28

60, opted to stay silent under a speculative fear that gang members would somehow discover his cooperation with the police and retaliate, J.A. 172.

But this credibility finding goes to Ramos Marquez's subjective belief, not the objective truth. In fact, every time Honduran officials *were* notified (not by Ramos Marquez, mind you) of criminal activity, they took action. Upon the death of one of Ramos Marquez's brothers, law enforcement went to the scene of the crime to investigate. J.A. 178. When another brother died, police arrived at the scene, took pictures, interviewed the brother's wife, and recorded a report. J.A. 180–81. And after one of Ramos Marquez's sisters told officials that MS-13 had visited her home with questions about another sibling's children, the police recorded her report too. J.A. 171, 419. (Moreover, contrary to Ramos Marquez's fear of gang relation, his sister has not suffered any additional harm or threats because of her cooperation with the authorities. J.A. 173.)

True, none of these investigations materialized in arrests. But we can hardly fault Honduran law enforcement on this score. Regarding one brother's death, there were no eyewitnesses around to aid investigation. J.A. 177–78. As to the other, the attackers had covered their faces. J.A. 168. Similarly, Ramos Marquez's sister could not so much as describe the gang members who had visited her. J.A. 173, 419. Ramos Marquez, by contrast, recognized his purported assailants by their appearance, and nothing was stopping him from fully disclosing this information to the Honduran police. J.A. 167.

## B.

It is a basic (albeit unfortunate) fact that many crimes go unsolved, even in countries with sophisticated law enforcement. Take the United States as an example: 56.2% of

29

violent crimes reported last year went without even an arrest. FBI, *UCR Summary of Reported Crimes in the Nation, 2024*, at 13 (Aug. 2025). And who knows how many unreported incidents, which represent over half of all violent offenses, go completely uninvestigated. *See* Susannah N. Tapp & Emilie J. Coen, *Criminal Victimization, 2024*, at 9 tbl. 6, Bureau of Just. Stats. (Sept. 2025).

Far from showing our nation's inability or unwillingness to tackle violent crime, these statistics demonstrate the inherent difficulty of police investigations—particularly when there are no eyewitnesses around. Honduras, of course, faces the same challenges. The majority expects too much of law enforcement by extrapolating from three purportedly unsolved investigations, each of which was marred by a dearth of witnesses, that any reasonable adjudicator would conclude Honduran officials cannot or will not control Ramos Marquez's claimed assailants, let alone consent to or acquiesce in his future suffering.

I do not for a moment minimize such harms as have allegedly befallen Ramos Marquez's family. But they still fail to address the consistent failure of Ramos Marquez to report offenses to the police. The majority inexplicably accepts this state of affairs. But how are crimes of this nature ever going to be resolved if the majority effectively disincentivizes contacts between petitioners and the authorities? To accept this separation cedes control of Honduras to the gangs and lights a path where law enforcement is destined to be ineffectual because it is kept in ignorance. Neutering indigenous law enforcement is in no one's interest except those lawless actors who would claim Honduras for themselves.

30

We have given up on this country. We have announced a preemptive conclusion that this nation is effectively incapable of taking constructive steps to address and ameliorate the problems that many nations face in attempting to improve the welfare of their citizens. The majority writes off Honduras's policing efforts whole cloth as "empty or token assistance." Maj. Op. at 16 (quoting *Orellana*, 925 F.3d at 153). But to repeat: One doesn't condemn others who were never given a chance. The only case the majority tenders on this issue involved a petitioner who "called the police 'many times' during a twelve-year period, calls to which the police often did not respond at all." *Orellana*, 925 F.3d at 152. The three investigations here, while allegedly unsuccessful, land far afield from the sustained abdication of law enforcement duties in the *Orellana* case.

Country conditions cannot save the majority either. For one thing, this type of evidence plays at most second fiddle to facts particular to the petitioner at hand. After all, both withholding of removal and CAT relief require some individualized risk of harm. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 430 (1987); *Ibarra Chevez v. Garland*, 31 F.4th 279, 290 (4th Cir. 2022). And even were these generalized reports applicable, the majority cites them selectively, ignoring those that cut in the government's favor. *See, e.g.*, J.A. 271, 281 (discussing Honduras's anti-gang initiatives and success in reducing the homicide rate). To find Ramos Marquez's reports more probative of persecution or acquiescence than did the IJ and BIA merely amounts to "reweigh[ing] the evidence," the very practice disallowed when we review the record for substantial evidence. *Gonahasa*, 181 F.3d at 542.

31

## II.

Taking a step back, Ramos Marquez's purported persecution and torture both pose questions of fact. *See, e.g.*, *Orellana*, 925 F.3d at 151; *Chicas-Machado v. Garland*, 73 F.4th 261, 272 (4th Cir. 2023). We therefore must review the IJ's and BIA's determinations on these issues for substantial evidence. *See* 8 U.S.C. § 1252(b)(4)(B). Yet the majority spends most of its time criticizing these jurists for abusing their discretion; that is, it applies an entirely different standard of review. *See, e.g.*, *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 101 (2016).

Why? Well, our case law provides that whenever we believe the IJ and BIA "failed to offer a reasoned explanation for its decision" or "distorted or disregarded important aspects of the applicant's claim," we can vacate and remand for a purported abuse of discretion. *Tassi v. Holder*, 660 F.3d 710, 719 (4th Cir. 2011). The alleged basis for this authority is, apparently, the following INA provision: "[T]he Attorney General's discretionary judgment whether to grant [asylum] shall be conclusive unless manifestly contrary to the law and an abuse of discretion." 8 U.S.C. § 1252(b)(4)(D); *see, e.g.*, *Mirisawo v. Holder*, 599 F.3d 391, 396–97 (4th Cir. 2010).

Our reliance on this language raises several concerns. For starters, abuse-of-discretion review does not erode our statutory duty to review administrative factfinding for substantial evidence. *See* 8 U.S.C. § 1252(b)(4)(B). Further, Ramos Marquez's petition does not even concern asylum. This means there is no discretion to be abused: withholding of removal and CAT protection are mandatory once the petitioner makes his requisite showings. *INS v. Aguirre-Aguirre*, 526 U.S. 415, 420 (1999); *Johnson v. Guzman Chavez*,

141 S. Ct. 2271, 2282 (2021). Also, what happened to requiring that the judgment be "manifestly contrary to the law?" The majority ignores the phrase, but "these words cannot be meaningless, else they would not have been used." *United States v. Butler*, 297 U.S. 1, 65 (1936); *see also Pulsifer v. United States*, 144 S. Ct. 718, 726 (2024) ("'And,' in grammatical terms, is of course a conjunction . . . .").

Moreover, labeling this doctrine "abuse-of-discretion review" is a misnomer. Truth be told, we invoke the framework to demand that the IJ and BIA more extensively engage with facts and arguments that we deem most important. Doing so undermines much of our case law. The majority picks with finest tweezers at IJs and the BIA, all in derogation of the presumption that they "properly discharge[] their official duties." *Nardea v. Sessions*, 876 F.3d 675, 680 (4th Cir. 2017) (quoting *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14–15 (1926)). And we have long explained that these jurists "need not . . . 'write an exegesis on every contention.'" *Casalena v. INS*, 984 F.2d 105, 107 (4th Cir. 1993) (omission in original) (quoting *Vergara-Molina v. INS*, 956 F.2d 682, 685 (7th Cir. 1992)). This makes good sense; immigration cases often contain voluminous briefing, testimony, and country-conditions reports, far too much material for even those familiar in the field (such as IJs and the BIA) to expressly discuss in writing.

Yet against this precedent, the majority faults the decisions below for failing to write exegeses about evidence that it anoints as most significant: Ramos Marquez's testimony and country-conditions reports. But the IJ and BIA did, in fact, address these topics. *Compare, e.g.*, Maj. Op. at 14–15 (claiming the IJ and BIA "ignored" Ramos Marquez's testimony and country-conditions evidence about Honduras's inability and unwillingness

33

to control MS-13), *with* J.A. 58 (specifying Ramos Marquez's testimony was "considered by the Immigration Court in its entirety"), *and* J.A. 65 ("[Ramos Marquez] submitted country conditions evidence that indicates violence, criminal groups, and corruption are a general problem throughout Honduras, but this alone is insufficient . . . .").

In sum, our court has misapplied 8 U.S.C. § 1252(b)(4)(D) and warped the meaning of discretion. What was intended as a two-element check on discretionary decisions in asylum claims has silently morphed into a one-element constraint on IJs and the BIA in asylum, statutory withholding-of-removal, and CAT claims. Once again, wholly ignored is petitioner's burden to prove that these primary decisionmakers acted in a manner "manifestly contrary to the law." On top of it all, we insist that IJs and the BIA effectively must wax poetic about every possible contention from a petitioner, no matter how fleeting or frivolous, lest we vacate and remand for a do-over.

I would hold otherwise. Rather than sifting through the decisions below in search of every fact that went unmentioned and only then turning to substantial evidence, we should be looking for substantial evidence the whole way down.

### III.

Reviewing the findings of fact below for only substantial evidence, as we must, this should have been a straightforward case. Even after Honduran officials repeatedly responded to alleged crimes against his relatives, Ramos Marquez never consulted the authorities himself. The IJ and BIA thus reasonably concluded that he—not Honduras—failed to uphold his end of the bargain in the oft-cooperative endeavor of solving crime.

34